# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARJORIE KOHLBERG, individually and as Administrator of the Estate of Edmund Kohlberg, DAVID EIJADI, individually and as Trustee of the David Azziz Eijadi and Barbara Anne Eijadi Revocable Trust Dated May 27, 2015, THOMAS MCDOUGALL, individually and as Trustee of the Thomas G. McDougall Trust dated November 17, 2005, PETER D. OTTAVIO, individually and as Trustee of the Peter D. Ottavio Revocable Living Trust dated February 19, 2016, MELISSA LASSOR, MARY LOU JURKOWSKI, JASON STEINBOCK, and BETSY SEARS, all on behalf of Themselves and all others similarly situated and derivatively on behalf of Nominal Defendants EYP HOLDINGS, INC. and EYP GROUP HOLDINGS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 20-cv-6250 |
| TOM BIRDSEY, LONG POINT CAPITAL, INC., LONG POINT CAPITAL FUND II. L.P., LONG POINT CAPITAL PARTNERS II, L.P., LONG POINT CAPITAL FUND III, L.P., LONG POINT CAPITAL PARTNERS III, L.P., IRA STARR, NORMAN SCHERR, ERIC VON STROH, DAVID WATKINS, and GREATBANC TRUST COMPANY, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and, | ) ) | |
| EYP HOLDINGS, INC., and EYP GROUP HOLDINGS, INC., | ) ) ) | |
| Nominal Defendants. | ) ) | |

**CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Marjorie Kohlberg, individually and as Administrator of the Estate of Edmund Kohlberg, David Eijadi, individually and as Trustee of The David Azziz Eijadi and Barbara Anne Eijadi Revocable Trust Dated May 27, 2015, Thomas McDougall, individually and as Trustee of the Thomas G. McDougall Trust dated November 17, 2005, Peter D. Ottavio, individually and as Trustee of The Peter D. Ottavio Revocable Living Trust dated February 19, 2016, Melissa Lassor, Mary Lou Jurkowski, Jason Steinbock and Betsy Sears, all on behalf of themselves and all others similarly situated and derivatively on behalf of Nominal Defendants EYP Holdings, Inc. and EYP Group Holdings, Inc. (collectively "EYP"), as and for their Complaint against Defendants Tom Birdsey, Long Point Capital, Inc., Long Point Capital Fund II, L.P., Long Point Capital Partners II, L.P., Long Point Capital Fund III, L.P., Long Point Capital Partners III, L.P., Ira Starr, Norman Scherr, Eric Von Stroh, David Watkins and GreatBanc Trust Company, allege as follows:

**Statement of the Case**

1.      Defendant Long Point Capital, Inc. ("Long Point") has developed a complex fraudulent scheme for certain of its private equity investments, by which Long Point has convinced unwitting employees who own equity to sell their stock to an Employee Stock Ownership Plan ("ESOP"). In the process, Long Point receives cash while those employees receive uncollectible notes, leaving the portfolio company saddled with overwhelming debt and debt servicing obligations.

2.      Long Point's scheme has involved a web of complicit or corrupted valuation firms, trustees, and company directors. Through this scheme, Long Point has been able to divert excessive cash to its affiliates, rather than maximize value for all stockholders to whom Long

Point and certain of its affiliates owe fiduciary duties as a controlling stockholder group. Through Long Point's ESOP scheme, minority stockholders and portfolio company employees are left holding subordinated and virtually worthless notes owed by over-leveraged payors that lack the ability to satisfy the overwhelming debt obligations incurred to generate the cash that Long Point takes.

3.      Here, in or about 2011, Long Point, through its affiliates Long Point Capital Fund II, L.P. and Long Point Capital Partners II, L.P. ("Long Point Fund II"), invested approximately $9 million into EYP and certain affiliates that operate as a national architecture and engineering firm based out of New York. Five years later, Long Point initiated its ESOP exit strategy. In connection with Long Point's scheme, on or about June 28, 2016, Long Point's affiliates, including Long Point Capital Fund III, L.P. and Long Point Capital Partners III, L.P. ("Long Point Fund III") received more than $44 million in cash, an approximately 500% return on the original investment.

4.      Long Point accomplished its ESOP scheme at EYP through its power to appoint and control three of the five members of EYP's board of directors, namely Defendants Ira Starr, Norman Scherr and Eric Von Stroh, all of whom were Principals, Partners and/or Managing Directors of Long Point, and by corrupting Defendant Tom Birdsey, a co-founder of EYP who remained a member of its board of directors and its Chief Executive Officer ("CEO") at the pertinent time, Defendant David Watkins, also a member of EYP's board of directors, and John Kempf, EYP's Chief Financial Officer ("CFO"). Through the conflicted board of directors and officers, Long Point pushed through the creation of an ESOP to become the buyer of all of EYP's stock at an inflated price, with Long Point receiving approximately $44 million in cash. Long Point generated this cash for itself by saddling EYP and its affiliates with senior secured

debt.

5.      EYP would not have qualified for such debt, in the tens of millions of dollars, but for projections that Long Point, Starr and Birdsey knowingly inflated.

6.      To help structure and employ the ESOP transaction and scheme, Long Point used corrupt and financially-interdependent advisors with which it does repeat business. Long Point's business records reflect that it had used Defendant GreatBanc Trust Company ("GreatBanc") as an ESOP trustee for a majority of ESOP exit transactions that it has held out as its experience in the area. Besides GreatBanc, Long Point regularly used Wilmington Trust Co. ("Wilmington Trust") as an ESOP trustee. At the relevant times, both GreatBanc and Wilmington Trust had reputations for cooperating with and ensuring a maximum and inflated value for Long Point's affiliates and other controlling stockholder groups. As a common scheme, these ESOP trustees allow the portfolio companies and ESOPs to incur excessive debt to outside lenders in order to provide Long Point's affiliates with cash, while providing subordinated junk notes to minority stockholders. As a result of these corrupt transactions, Long Point's affiliates receive much more cash than appropriate as a controlling stockholder group, while leaving minority stockholders with subordinated, near worthless notes owed by a portfolio company forced to service massive debt. Many of these types of transactions can result in an insolvent portfolio company.

7.      The Department of Labor (the "DOL") has forced both of Long Point's regular ESOP trustee counterparts, GreatBanc and Wilmington Trust, to pay collectively more than $90 million dollars in damages and fines for participating in schemes by which ESOPs overpay the controlling stockholders that selected them. GreatBanc's and Wilmington's reputations for corruption were or should have been known to Long Point prior to the execution of its scheme here. Their reputations should have been a reason to avoid them, but instead served as a (if not

the) reason Long Point has selected these entities to serve as ESOP trustees for its scheme.

8.      Consistent with Long Point selecting a trustee that would compromise its fiduciary duties to serve Long Point's interest, according to Long Point's own business records, Long Point and GreatBanc shared the same outside counsel for the implementation of the ESOP scheme at EYP. According to certain of Long Point's business records, K&L Gates provided a joint legal representation of Long Point and GreatBanc in connection with the ESOP scheme at EYP. This conflicted representation facilitated Long Point's exit with an approximately 500% return on investment after only about five years, while minority stockholders received uncollectible notes.

9.      Long Point has employed its ESOP scheme because of several ways in which an ESOP facilitates its exploitation of minority stockholders. First, key minority stockholders are often approaching retirement, making them somewhat less concerned about the long-term prospects of the business. Second, most employees becoming part of an ESOP will not invest significant money for personal counsel to protect their interests, instead relying on counsel for the company. Third, certain advisors in the ESOP industry that offer trustee services, such as GreatBanc and Wilmington Trust, view DOL fines as a mere cost of doing business while they maintain intimate and financially-interdependent relationships with certain private equity funds and managers, such as Long Point and its affiliates, that are willing to commit substantial fee arrangements for trustees to consummate ESOP exit transactions.

10.     Here, Long Point struck gold in terms of vulnerable victims and management ripe for corruption. As described in more detail below, Defendant Birdsey, who was CEO and Chairman of EYP, not only appeared ready for retirement, but also faced a criminal investigation into his role with a key client, SUNY Polytechnic Institute. Birdsey sat on the board of a SUNY

Polytechnic Institute affiliate. Criminal charges against others later indicated that he had improperly caused EYP to enter into certain lease transactions and other arrangements in exchange for large and highly-profitable no-bid or rigged-bid contracts with SUNY Polytechnic Institute awarded in EYP's favor. Long Point not only tolerated conduct by Birdsey that should have resulted in his removal as the CEO, but actually issued him substantial stock options, valued in excess of $5 million, for diverting his loyalty exclusively to Long Point. In connection with the ESOP scheme, Long Point even arranged to divert $2.7 million for the unique benefit of Birdsey by classifying a payment for him as an estimated tax payment, thereby treating him differently and better than other noteholders, none of whom received such options.

11.     Leading up to the implementation of the ESOP scheme, while unknown to minority stockholders of EYP, Birdsey and the other Defendants knew that business EYP received from SUNY Polytechnic Institute had been illegitimately obtained and the subject of a joint state and federal criminal investigation, yet still improperly included revenue from such business in projections used for establishing stock prices for the ESOP scheme that would pay off Long Point and its affiliates.

12.     Long Point and Birdsey collaborated to corrupt EYP's CFO, Kempf, who intentionally relied on inflated projections and overstated EYP's revenue and/or profits to hide developing cash flow issues. In exchange for Kempf's loyalty, Long Point and Birdsey facilitated his role as a "Sellers' Representative." At the closing of the ESOP scheme, $1.7 million in funds flowed to Sellers' Representatives.

13.     The last management check on Long Point and Birdsey at EYP, Ed Kohlberg, became seriously ill by mid-2015 and died later that year. Shortly before Ed Kohlberg died, in or about September 2015, Birdsey arranged for EYP to purchase Ed Kohlberg's stock at a valuation

at least 40% lower than what Long Point and Birdsey would use just a few months later for the ESOP exit transaction. As Ed Kohlberg's illness made him less involved in EYP's business, Birdsey's and Long Point's ESOP scheme came to fruition.

14.     Upon Ed Kohlberg's death, a vacant position on the EYP board of directors arose. Long Point and Birdsey schemed to fill this seat with David Watkins, an EYP employee who has committed loyalty to Birdsey and has done as instructed rather than serving the best interest of EYP or its stockholders. Watkins became privy to financial information from which he knew or should have known that Long Point grossly overvalued EYP, and that EYP would not be able to pay its debts post-ESOP transaction. After receiving preferential notes, Watkins purposefully concealed material financial information from EYP stockholders, including those stockholders who were formerly employed by WHR Architects, Inc., an architecture firm that EYP bought prior to the ESOP transaction.

15.     The ESOP scheme offered such undue benefits to Long Point that it caused the conflicted board of directors to reject summarily an opportunity to sell EYP in a strategic transaction that offered better value for other constituents, such as a sale to a publicly-traded architecture and engineering firm, Stantec, Inc. ("Stantec"). In or about November 2015, Birdsey canceled a follow-up meeting with Stantec leadership, in order to help Long Point pursue exclusively the ESOP scheme, for the benefit of Long Point and its affiliates, at the expense of minority stockholders.

16.     The Stantec transaction would have offered synergies valued, from the perspective of minority stockholders, at tens of millions of dollars in greater value for minority stockholders than that offered by an ESOP, which here, as is customary, did not provide actual synergy value. But Stantec, an experienced suitor, would not have participated in such an

obvious breach of fiduciary duties by Long Point in diverting nearly all of the cash from a controller-initiated transaction to Long Point and its affiliates. Stantec would also have expected an entirely fair process and price for minority stockholders. A fair process and price would have prevented Long Point from exploiting minority stockholders the way that it did, causing EYP's board of directors to terminate advanced discussions with Stantec and avoid discussions with other strategic suitors, without informing minority stockholders of material aspects of these opportunities.

17.     As a result of its fraudulent scheme, Long Point, its affiliates, its appointed directors, and Birdsey diverted at least $44 million in cash to Long Point's affiliates, while minority stockholders received three categories of notes: (1) "redemption" notes for those already retired, generally carrying a maturity date in 2021; (2) "Group 1" notes generally for those planning an imminent retirement, and generally (but with exception) carrying a maturity date in 2051; and (3) further subordinated "Group 2" notes for then-existing employees who did not have imminent retirement plans, also carrying a maturity date of 2051. Since that time, EYP has failed to make any of the scheduled pre-maturity installment or interest payments on any of these categories of notes given to minority stockholders.

18.     Since the completion of the ESOP transaction, Birdsey, Long Point's Starr (jointly serving as an EYP board member and Long Point managing partner) and Watkins have fraudulently concealed their wrongdoing. As described in detail below, they retained board positions at EYP that allowed them to alter messaging to the Plaintiffs and others similarly situated, dissuading them from enforcing rights. Through at least in or about July 2018, on behalf of themselves, each other and Long Point, Birdsey, Starr and Watkins touted, in a materially false way, that the ESOP *enhanced* EYP's ability to satisfy loan covenants and resulting

payments, but that business results supposedly created temporary cash flow problems that would have disallowed such payments even in the absence of the ESOP transaction. Not until 2020 did Plaintiffs receive sufficient information from EYP to discover its causes of action.

19.     In reality, but unknown to the Plaintiffs and those similarly situated, the debt obligations incurred by the ESOP transaction had paralyzed EYP's and its affiliates' ability to satisfy covenants in favor of Key Bank, EYP's senior secured lender, thereby preventing payments on the subordinated notes held by Plaintiffs. Despite having to amend credit facilities with Key Bank, not until July 10, 2018, did Birdsey or Long Point Capital begin to disclose significant details about the impact of onerous covenants at play. Until at least July 10, 2018, just two days before the conviction of SUNY Polytechnic Institute's President and CEO, Birdsey, Starr and Watkins continued to lull Plaintiffs and those similarly situated into a false sense of security that only temporary cash flow issues existed and that payments would begin shortly, when in fact EYP was in the zone of insolvency as a result of massive debt servicing costs.

20.     To this day, Birdsey, Starr and Watkins have remained on EYP's board of directors, falsely and misleadingly deflecting blame onto others in a manner designed to delay and prevent noteholders from discovery of Defendants' fraudulent ESOP scheme and their scienter within that scheme, thereby deterring them from enforcing their rights.

21.     In or about the fall of 2019, EYP employed outside counsel to conduct an internal investigation into restructuring needs and Long Point's conduct. Only as a result of these investigative and restructuring efforts in late 2019 and early 2020 did minority stockholders learn of Birdsey's, Long Point's and Watkins' culpability and scienter in connection with their ESOP scheme.

22.     Birdsey, Long Point, Long Point Fund II, Long Point Fund III, Starr, Scherr, Von

Stroh, Watkins and GreatBanc are liable to Plaintiffs for the $44 million improperly paid to Long Point's affiliates, $2.7 million paid for the benefit of Birdsey, and the opportunity lost by not consummating a sale to Stantec or other market-value strategic transaction in connection with a fair process and price for minority stockholders outside of the controlling stockholder group.

## Jurisdiction and Venue

23.     This Court has jurisdiction over this dispute under 28 U.S.C. § 1331 because it poses federal questions on claims arising under Sections 10(b) and 27 of the Securities Exchange Act of 1934 and SEC Rule 10b-5, as well as embedded federal questions under Section 404(a)(1)(A)-(D) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1104(a)(1)(A)-(D).

24.     Venue is appropriate in this District because Defendants Starr, Long Point, Long Point Fund II, Long Point Fund III, and/or Von Stroh, and GreatBanc reside in this District, and all of the Defendants reside in New York; Nominal Defendants reside in New York; and a substantial portion of the events giving rise to this action occurred in this District.

## Parties

25.     Plaintiff Marjorie Kohlberg is a resident of Virginia and the administrator of the estate of her late husband, Ed Kohlberg. As a result of the Defendants' ESOP scheme, Ms. Kohlberg holds, in her individual capacity and as the Administrator of the Estate of Ed Kohlberg, an amended note dated June 28, 2016 in the outstanding amount of $3,330,377.21 plus interest.

26.     Plaintiff David Eijadi is a resident of Minnesota and Trustee of the David Azziz Eijadi and Barbara Anne Eijadi Revocable Trust Dated May 27, 2015. As a result of the Defendants' ESOP scheme, Mr. Eijadi holds redemption notes dated June 28, 2016 in the outstanding amount of $985,475.86 plus interest.

27.     Plaintiff Thomas McDougall is a resident of Minnesota and a Trustee of the Thomas G. McDougall Trust dated November 17, 2005. As a result of the Defendants' ESOP scheme, Mr. McDougall holds a redemption note initially issued in 2015 in the amount of $248,638.67 of which approximately $165,759 remains outstanding, and a Group 1 note dated June 28, 2016 in the outstanding amount of $5,870,735.98, plus interest.

28.     Plaintiff Peter D. Ottavio is a resident of New York and a Trustee of the Peter D. Ottavio Revocable Living Trust dated February 19, 2016. As a result of the Defendants' ESOP scheme, Mr. Ottavio holds a Group 1 note dated June 28, 2016, in the outstanding amount of $4,790,584.37 plus interest.

29.     Plaintiff Melissa Lassor is a resident of South Carolina. As a result of the Defendants' ESOP scheme, Ms. Lassor holds a Group 1 note dated June 28, 2016 in the outstanding amount of $1,615,667.30 plus interest, as amended to confirm a five-year maturity date in 2021.

30.     Plaintiff Mary Lou Jurkowski is a resident of North Carolina. As a result of the Defendants' ESOP scheme, Ms. Jurkowksi holds redemption notes with five-year maturity terms, one initially issued on March 18, 2016 and amended on June 28, 2016 in the amount of $166,952.01, and another dated June 10, 2016 in the amount of $164,343.15, with an outstanding balance of approximately $275,644.51 plus interest.

31.     Plaintiff Steinbock is a resident of Iowa. As a result of the Defendants' ESOP scheme, Mr. Steinbock holds a Group 2 note dated June 28, 2016 in the outstanding amount of $951,172.96 plus interest, with a maturity date in or about 2051.

32.     Plaintiff Sears is a resident of South Carolina. As a result of the Defendants' ESOP scheme, Ms. Sears holds a Group 2 note, dated December 30, 2016 in the outstanding amount of $760,148.06, plus interest.

33.     Defendant Birdsey is a resident of New York who served as CEO of EYP at relevant times through the implementation of the ESOP scheme, and as a director of EYP through the present. For several decades, Birdsey managed EYP or its affiliates with Ed Kohlberg. Birdsey served as Chairman and CEO of EYP from 2005 until on or about December 31, 2018.

34.     Defendant Long Point is a corporation formed under the laws of Delaware with its principal place of business in this District in New York. At all relevant times, Long Point has managed the private equity funds that are Defendants in this action and owed fiduciary duties to all Plaintiffs as part of the controlling stockholder group.

35.     Defendants Long Point Fund II and Long Point Fund III are limited partnerships formed under the laws of Delaware with their principal places of business in this District in New York and, upon information and belief, each consisting of a general partner that resides in New York. Long Point Fund II and Long Point Fund III comprised, along with Long Point and Starr, the controlling stockholder group of EYP through the implementation of the ESOP scheme. At the time of its 2011 investment in EYP, Long Point used Long Point Fund II to make the investment. On or about November 25, 2014, Long Point announced the launch of Long Point Fund III. When it completed the ESOP scheme, Long Point directed EYP to forward cash proceeds to Long Point Fund III.

36.     Defendant Starr is a resident of New York, the co-founder and a Managing Director of Long Point, and a Long Point-appointed director of EYP since Long Point first invested in it in 2011.

37.     Defendant Scherr is a resident of Michigan, held out by Long Point as one of its principals, and a Long Point-appointed director of EYP through the implementation of the ESOP scheme.

38.     Defendant Von Stroh is a resident of New York, held out by Long Point as a managing partner, and a Long Point-appointed director of EYP through the implementation of the ESOP scheme.

39.     Defendant David Watkins is a resident of Texas who served as a director of EYP at all relevant times through the present.

40.     Defendant GreatBanc is a resident of New York, has multiple financial and close business relationships with Long Point and, at relevant times, prepared to serve and then served as ESOP trustee within the ESOP scheme.

41.     Nominal Defendants EYP Holdings, Inc. and EYP Group Holdings, Inc. (collectively "EYP") are corporations formed under the laws of Delaware with principal places of business in New York. Through various affiliates and subsidiaries, EYP provides architecture and engineering services. Plaintiff Kohlberg's late husband and all other Plaintiffs worked at EYP, had held minority ownership interests in EYP and were, at relevant times, owed fiduciary duties by Birdsey, Long Point, Long Point Fund II, Long Point Fund III, Starr, Scherr, Von Stroh, and Watkins.

42.     Over recent months, EYP has repeatedly informed all Plaintiffs that their notes are uncollectible, with EYP in the zone of insolvency and in need of a restructuring. Each of the

Plaintiffs holding redemption and Group 1 notes expected to enjoy retirement with his or her earned nest egg, and the others holding Group 2 notes expected substantial funds for their future. Instead, the scheme to defraud them has caused them substantial stress and financial pressure. In total, this group of named Plaintiffs alone is owed approximately $20 million with interest. As a group, they are qualified to represent a class of noteholders, as described in more detail below, in claims against the Defendants for their fraudulent ESOP scheme.

## Factual Background

### Long Point Targets EYP

43.     Founded in 1972 in New York, EYP provides architecture and engineering services. EYP has expanded beyond New York, growing at its peak to more than 600 employees across 14 offices throughout the country.

44.     Prior to Long Point's investment in 2011, EYP had been consistently ranked as one of the nation's top architecture and engineering firms. Just prior to the investment, EYP had been named fifteenth overall and second in the education sector on Engineering News Record's list of the Top 100 Green Design Firms. Long Point viewed EYP as one of the world's leading architecture and engineering firms.

45.     To induce EYP to allow Long Point to invest in EYP, Long Point proposed to EYP a plan for synergies, such as those benefitting from horizontal and vertical services in planning, design, program and cost management and consulting, separately or as an integrated package. Long Point held out these synergies with their other portfolio companies, including CHA and Cumming Group, and later Woolpert, an international architecture, engineering and geospatial firm. Long Point had invested in CHA through Long Point Fund II in or about February 2009.

46.     On or about August 10, 2011, Long Point closed and announced its investment in EYP. Long Point invested approximately $9 million for an approximately 30% interest in EYP, which also included the right to appoint three of five members on the board of directors and thereby Long Point's right and ability to control the board.

### The 2015-2016 Architecture and Engineering Marketplace

47.     In 2015 and 2016, the architecture and engineering industry was ripe for strategic transactions. For 2015, as an example, Morrissey Goodale tracked a record 234 sales of domestic architecture and engineering firms. This flurry of activity reflected a greater than 5% increase over the flurry of 222 domestic deals completed in 2014. These transactions included AECOM's $6 billion acquisition of the engineering and design firm URS Corporation. In June of 2016 alone (when Mr. Birdsey and Long Point Capital were consummating their ESOP scheme), the industry experienced significant merger activity. For example, MorrisSwitzer Environments for Health, Ascension Group Architects, and daSilva Architects merged into Environments for Health Architecture. Shortly thereafter, Mason & Hanger, the Day & Zimmermann Company in design, architecture and engineering solutions, acquired the architecture and engineering firm Hankins & Anderson. Later that year, EwingCole, the architecture, engineering, and interior design firm, acquired BBH Design, a planning, design, and design research services firm.

### Strategic Transaction Opportunities with Stantec or Others

48.     By in or about February 2015, EYP engaged as a financial advisor Houlihan Lokey ("Houlihan") to analyze opportunities. Houlihan expressed strong optimism about the climate for a transaction and EYP's candidacy as a target.

49.     Houlihan stressed to EYP and Long Point the availability and value of synergies in an exit transaction, recommending a build out of the synergy story.

50.    Houlihan provided expert guidance on EYP's unique appeal within its synergy story, including EYP's exceptional industry-wide recognition with a diverse customer and end-market base; an outstanding and sustainable financial profile with a highly-scalable platform; an industry thought leadership with unparalleled barriers to entry; and significant growth opportunities with a proven track record.

51.    By on or about February 12, 2015, Houlihan had identified Stantec, a publicly-traded competitor, on a short list of strategic potential suitors offering adequate synergies for an acquisition of EYP. Houlihan identified Stantec as having an equity-value to EBITDA ratio reflecting an 11.8x multiplier. Houlihan also described the benefits and logistics of a sales process that would generate bidding activities among multiple suitors.

52.    EYP had regularly used a consultant named Terry Johnson of Modicum, LLC, for assistance with acquisitions. Johnson proceeded into discussions with Stantec about an acquisition of EYP. By in or about September 2015, Johnson had engaged in substantial discussions with Stantec's Vice President, Acquisitions and Strategic Planning.

53.    Also by late September 2015, Stantec offered an opportunity for EYP to enjoy greater value in a strategic acquisition with synergies, significantly beyond the value that an ESOP offered, particularly from the perspective of EYP's minority stockholders. Upon information and belief, Stantec made known that it was prepared to acquire EYP, at a value greater than what could be obtained through the ESOP scheme that Defendants ultimately implemented.

54.    By in or about October 2015, Stantec sought to arrange for its President/CEO and Executive Vice President to meet with EYP's leadership.

55.    On or about October 22, 2015, Stantec made arrangements to meet with Johnson

and at least Birdsey from EYP on November 10, 2015. Upon information and belief, Stantec was eager to complete an acquisition of EYP at fair market value that would take into consideration the synergies between the parties.

56.     After the November 10, 2015 follow-up meeting about the Stantec acquisition of EYP had been scheduled, Birdsey canceled the meeting and terminated those discussions without a valid explanation.

57.      In response to recent requests for board minutes concerning the potential acquisition of EYP by Stantec or other suitors, EYP has indicated in substance that no pre-ESOP board minutes from 2015 or early 2016 exist at this time, if they ever did.

58.     At about the same time that Birdsey canceled the follow-up meeting with Stantec's leaders, Birdsey, on behalf of EYP and Long Point, facilitated the purchase by EYP of stock held by the Estate of Ed Kohlberg, who passed away on or about October 17, 2015. Ed Kohlberg had managed EYP with Birdsey for decades. By in or about September 2015, Ed Kohlberg had become extremely sick and would soon die. At that time, Birdsey negotiated the purchase of Ed Kohlberg's stock at a valuation per share of approximately $2,700, which was less than 55% of the valuation Birdsey and Long Point would enjoy just several months later when they implemented their ESOP scheme at a per share price of approximately $5,100.

59.     The stock in EYP held by Ed Kohlberg and others, as well as notes issued in return for them as ongoing investments in EYP in connection with the ESOP scheme, constituted "securities" within the meaning of federal securities laws.

60.     With Ed Kohlberg gone, Birdsey and Long Point were left unchecked in their efforts to exploit minority stockholders, which they decided to accomplish through an ESOP they would create as a buyer of EYP stock.

*Long Point's Use of GreatBanc as ESOP Trustee*

61.     Long Point has held out its experience in creating ESOP exit transactions through the regular use of GreatBanc as an ESOP trustee.

62.     Besides GreatBanc, Long Point has relied on Wilmington Trust multiple times as an ESOP trustee.

63.     These two entities have had reputations for serving the interests of the private equity funds or controlling stockholders that bring them in as trustees, rather than the interests of the ESOP beneficiaries. The DOL has taken significant action against both GreatBanc and Wilmington Trust, imposing collectively more than $90 million in damages and fines against them for similar schemes that harmed minority stockholders and employees in favor of cash to controlling stockholders.

64.     Shortly before Long Point brought GreatBanc in as ESOP trustee at EYP, on June 2, 2014, the DOL reached a settlement agreement with GreatBanc imposing a long list of strict rules with which GreatBanc must comply whenever serving as an ESOP trustee. A copy of this "AGREEMENT CONCERNING FIDUCIARY ENGAGEMENTS AND PROCESS REQUIREMENTS FOR EMPLOYER STOCK TRANSACTIONS" is attached hereto as Exhibit A and incorporated herein by reference.

65.     These rules from the Department of Labor focused on, among other things, the qualifications of any financial advisor performing a valuation in connection with an ESOP transaction, avoiding a financial advisor with potential conflicts of interest, and record-keeping requirements. Among other things, GreatBanc agreed in pertinent part that it would:

- prudently determine that its reliance on the valuation advisor's advice is reasonable before entering into any transaction in reliance on the advice;

- not use a valuation advisor for a transaction that has previously performed work –

including but not limited to a "preliminary valuation" – for or on behalf of any counterparty to the ESOP involved in the transaction;

- obtain written confirmation from the valuation advisor selected that none of the list of potential conflicts exist;

- prepare a written analysis that included:

    1. The reason for selecting the particular valuation advisor;
    2. A list of all the valuation advisors that the Trustee considered;
    3. A discussion of the qualifications of the valuation advisors that the Trustee considered;
    4. A list of references checked and discussion of the references' views on the valuation advisors;
    5. A statement whether the valuation advisor was the subject of prior criminal or civil proceedings; and
    6. A full explanation of the bases for concluding that the Trustee's selection of the valuation advisor was prudent.

- oversee the valuation advisor in part by requiring it to document the individuals responsible for providing any projections reflected in the valuation report, and as to those individuals, conduct reasonable inquiry as to (a) whether those individuals have or reasonably may be determined to have any conflicts of interest in regard to the ESOP (including but not limited to any interest in the purchase or sale of the employer securities being considered); and (b) whether those individuals serve as agents or employees of persons with such conflicts, and the precise nature of any such conflicts; and (c) record in writing how the Trustee and the valuation advisor considered such conflicts in determining the value of employer securities;

- critically assess the reasonableness of any projections (particularly management projections), and if the valuation report does not document in writing the reasonableness of such projections to the Trustee's satisfaction, the Trustee will prepare supplemental documentation explaining why and to what extent the projections are or are not reasonable;

- preserve documents for at least six years;

- not cause an ESOP to purchase employer securities for more than their fair market value or sell employer securities for less than their fair market value. (The DOL states that the principal amount of the debt financing the transaction, irrespective of the interest rate, cannot exceed the securities' fair market value.)

- not cause an ESOP to engage in a leveraged stock purchase transaction in which the principal amount of the debt financing the transaction exceeds the fair market value of the stock acquired with that debt, irrespective of the interest rate or other terms of the debt

used to finance the transaction;

- consider whether it is appropriate to request a claw-back arrangement or other purchase price adjustment(s) to protect the ESOP against the possibility of adverse consequences in the event of significant corporate events or changed circumstances. (The Trustee will document in writing its consideration of the appropriateness of a claw-back or other purchase price adjustment(s)); and,

- The Trustee may, consistent with its fiduciary responsibilities under ERISA, employ, or delegate fiduciary authority to, qualified professionals to aid the Trustee in the exercise of its powers, duties, and responsibilities *as long as it is prudent to do so*.

66.     In connection with the Defendants' ESOP scheme at EYP, GreatBanc violated the letter and spirit of the rules to which it had agreed with the DOL. Defendants defrauded Plaintiffs and those similarly situated in part by causing GreatBanc to breach its fiduciary duties under ERISA. In addition to flaws and/or violations of the DOL-imposed rules appearing in the valuation report that it obtained, GreatBanc essentially abandoned its valuation advisor's report during negotiations. Instead, GreatBanc enabled Long Point to drive up the price through a subjective and biased report without safeguards such as those required by ERISA and the DOL. Long Point had knowingly and improperly used or relied on inflated projections, excessive multiples of EBIDTA and/or entities or transactions as comparables that improperly took synergies into consideration, which should not have been factored into a valuation for an ESOP transaction.

67.     According to certain of Long Point's business records, Long Point and GreatBanc even improperly shared outside counsel, K&L Gates, for the implementation of the ESOP scheme at EYP, which was not and could not have been perceived as prudent for GreatBanc to do as the ESOP trustee. This joint representation deprived the ESOP and other participants in the transaction of certain key legal advice and safeguards independent of Long Point's interests.

68.     As a result and known to Long Point and Birdsey, GreatBanc breached its

fiduciary duties by causing the ESOP to engage in a leveraged stock purchase transaction in which the principal amount of the debt financing the transaction exceeded the fair market value of the stock acquired with that debt, without meaningfully considering or actually requiring a claw-back arrangement or other purchase price adjustment(s) to protect the ESOP against the possibility of adverse consequences in the event of significant corporate events or changed circumstances.

69.     By using GreatBanc in the role of ESOP trustee, Long Point and Birdsey were able to and did inflict inflated projections into the valuation and transaction price of the stock. Among other things, Defendants caused and adopted material overstatements of revenue projections for business from the SUNY Polytechnic Institute, in light of Birdsey's, Starr's, Long Point's and Watkins' knowledge that substantial business from SUNY Polytechnic Institute had been illegitimately obtained and was the subject of a joint state and federal criminal investigation.

70.     Long Point's and its affiliates' culpability is reflected in their continued use of GreatBanc and Wilmington Trust with various portfolio companies despite their repeated problems with the DOL and beneficiaries of ESOPs.

***Birdsey's Exposure to Criminal Liability and His Motivation to Sell on Long Point's Terms***

71.     By mid-2015, state and federal criminal investigators had undertaken a joint criminal investigation into illegal contracting, commercial bribery and bid rigging by and involving SUNY Polytechnic Institute, one of EYP's biggest clients.

72.     Unbeknownst to Plaintiffs, in or about 2015 and early 2016, Birdsey feared that a joint state and federal criminal investigation into SUNY Polytechnic Institute would lead to a

loss of substantial business for EYP, as well as criminal exposure for Birdsey.

73.    According to information obtained in recent months from EYP, by in or about early 2016 before the implementation of the ESOP scheme, Birdsey received a grand jury subpoena during the criminal investigation into conduct involving SUNY Polytechnic Institute.

74.    Notwithstanding Birdsey's and Long Point's knowledge that EYP would not likely retain SUNY Polytechnic Institute as a client, Birdsey, Starr, Watkins and Long Point included ongoing revenue from SUNY Polytechnic Institute, without necessary adjustments or disclosures about the risk of decline, as a material item in financial projections used to help establish stock price and note amounts in connection with the ESOP scheme at EYP.

75.    In or about September 2016, New York state law enforcement charged the President and CEO of SUNY Polytechnic Institute, Alain Kaloyeros, for, among other things, illegal bid-rigging transactions with a firm led by "Architect-1." Federal criminal charges against Kaloyeros addressed other aspects of commercial bribery in which he engaged.

76.    On July 12, 2018, Kaloyeros was convicted of the federal charges. As it turns out, the phrase "Architect-1," used in the state criminal charges, referred to Birdsey.

77.    Birdsey's motives to participate in Long Point's ESOP scheme included loyalty to Long Point that Long Point had purchased from him. By late 2015, Long Point Capital and Birdsey had reached an arrangement for the increase of his holdings and options in EYP, which made Birdsey beholden to Long Point. According to certain records of EYP, from 2013 to 2014, Birdsey's direct stock ownership in EYP increased from approximately 3,451 shares to 4,759 shares. Long Point specifically agreed to a grant by EYP to Birdsey of 1,308 options valued in EYP's records at approximately $5,469,263.36. These financial transactions created a financial

interdependence between Long Point and Birdsey.

78.     In connection with the implementation of the ESOP scheme at EYP, Long Point took further steps to purchase Birdsey's loyalty to and financial interdependence with it. Not only had Long Point caused the issuance of options and greater equity to Birdsey, but Long Point also caused EYP to make a unique payment of approximately $2.7 million for the benefit of Birdsey, classified as an estimated tax payment, at the time of the ESOP's launch. That allowed the delivery of a substantial amount of cash for the benefit of Birdsey without attracting attention to him in a transaction document setting forth the flow of funds.

79.     To solidify Birdsey's and Watkins' loyalty, Long Point allowed both of them to receive Group 1 notes rather than further subordinated Group 2 notes, despite the fact that Birdsey and Watkins intended to continue working for EYP, and that they have provided services for EYP through the present.

80.     Long Point also took steps to purchase Kempf's loyalty to and financial interdependence with it. Long Point appointed Starr and Kempf to serve as the "Sellers' Representative" in the ESOP transaction. At the close of transaction, Long Point caused EYP to send funds in the amount of $1.7 million to Sellers Representative. A flow of funds record shows funds going to Kempf, but not Starr, for Kempf's role as a Sellers' Representative.

***Birdsey, Starr, Von Stroh, Scherr and Watkins Violate Their Revlon and Other Fiduciary Duties***

81.     Although not known to Plaintiffs at the time, Birdsey's and Long Point's scheme involved deliberately unrealistic projections and an inflated valuation of EYP, in a transaction that relied on relatively worthless notes for its victims.

82.     When Birdsey and Long Point planned to sell change-of-control over EYP, *Revlon* duties arose under Delaware law for all of EYP's board members. *Revlon* and its progeny

provide for enhanced scrutiny of transactions that effect a change of corporate control and

require directors to maximize value for minority stockholders by considering all reasonably

available exit-stage transactions. In such situations, all members of boards of directors are

obliged to make an informed and deliberate judgment, in good faith, about whether the sale to a

third party that is being proposed by the majority stockholder will result in a maximization of

value for the minority shareholders. Here, conflicts of interest preclude reliance by the

Defendants on the business judgment rule.

83.     A sale of EYP to a strategic partner such as Stantec, rather than to an ESOP,

would have offered synergies, but likely would have required *pro rata* treatment of other

stockholders consistent with the treatment of Long Point and Birdsey. Upon information and

belief, Stantec offered an imminent opportunity for an acquisition at a greater actual value for

EYP's stockholders as a whole than did the ESOP scheme. The use of an ESOP offered the

opportunity, however, for Birdsey, Starr, Watkins and Long Point to create a buyer on their

terms, with access to cash for select wrongdoers at the expense of other stockholders who would

receive worthless or virtually worthless notes.

84.     Without meaningful analyses that should be reflected in board minutes, but are

not, the EYP board rushed its ESOP scheme and chose not to explore or consummate the

availability of strategic suitors that would have offered added value in synergies. Shortly before

implementation of the ESOP, and contrary to the board of directors' *Revlon* duties, Birdsey

summarily terminated discussions with Stantec, a large, publicly-traded suitor in the design and

engineering industry that sought to acquire EYP.

85.     The Defendants' ESOP scheme facilitated an exit transaction with more than $40

million cash out the door to Long Point, while saddling EYP and the ESOP with the impact of

24

enormous debt and debt servicing burdens. When an exit strategy triggers a stockholder investment decision, the directors of a Delaware corporation are required to disclose fully and fairly all material information within the board's control. Inadequate disclosures about a "liquidation preference" can be deemed material as a matter of law. Boards functioning under the control of private equity funds operate under a business model that causes them to seek outsized returns and to liquidate (typically via a sale) even profitable ventures that fall short of their return hurdles, and that otherwise would require investments of time and resources that could be devoted to more promising ventures. Birdsey, Starr, Von Stroh, Scherr, and Watkins, as well as Long Point itself in its control of the board of EYP, had interests that diverged from those of EYP's other stockholders generally. Had the EYP board members and controlling stockholders fulfilled their fiduciary duties and consummated a transaction based on interests aligned with other stockholders, EYP and its constituents would likely have enjoyed greater than $95 million in value of which they have been deprived.

86.     Each of Birdsey, Starr, Scherr, Von Stroh and Watkins participated as directors of EYP's board, to approve the ESOP transaction, without satisfying their *Revlon* and other fiduciary duties, for the benefit of themselves, Long Point and its affiliates, at the expense of minority stockholders. Instead of fulfilling *Revlon* duties and making adequate disclosures, Birdsey and Long Point created a buyer, and imposed an unfair price through an unfair process, including their use of incomplete, false and misleading disclosures.

87.     As a result of their scheme, Long Point and Birdsey received cash and other personal benefits. Long Point received more than $44 million as a return on an investment of approximately $9 million. Other stockholders received notes that were worth far less than their face value. Since the implementation of the ESOP and Long Point's exit, EYP has failed to make

the contemplated installment payments on notes for noteholders and former shareholders.

88.     Long Point, Birdsey, Starr and Watkins knew that Group 2 noteholders would not get paid, or recklessly disregarded the likelihood that they would not get paid, the full value of their notes. That is why Long Point and Birdsey purposefully assigned Group 2 notes a maturity date of 2051, approximately thirty-five years after the ESOP transaction, and long after Birdsey and Long Point would no longer be involved in EYP (if it still existed).

89.     In order to ensure that their scheme was approved, one of Long Point's "transaction" counsel for the ESOP conversion, Ropes & Gray, also served as EYP's counsel in corporate matters, thus assuring that neither EYP nor its stockholders had truly independent counsel with adequate information to question Long Point's scheme. Long Point shared other outside counsel for the ESOP conversion, K&L Gates, with GreatBanc.

90.     As of June 28, 2016, there were no independent fiduciaries or unconflicted advisors involved in the structuring, valuation, and approval of the ESOP transaction, thus assuring that the fraudulent nature of the transaction remained hidden from EYP's minority stockholders.

91.     Long Point was not satisfied with the $44 million in cash and wanted an additional $3 million for the purchase of its majority interest in EYP. Unable to obtain further financing so that Long Point could receive the $3 million in cash, EYP, Inc. issued Long Point a $3 million note, which conflicted board members allowed despite them being structurally superior to the redemption, Group 1, and Group 2 notes.

92.     At the close of the transactions, EYP and certain affiliates were left with an approximately $170 million debt and limited cash on hand, while facing an uncertain future due

to ongoing criminal prosecution concerning one of its largest and most profitable clients.

93.     As of June 28, 2016, EYP was effectively rendered in the zone of insolvency. Long Point, Birdsey, Von Stroh, Scherr and Watkins knew that EYP lacked the prospects for meeting obligations to its redemption, Group 1 and Group 2 noteholders.

***Birdsey Continues to Defraud Noteholders after the Closure of the ESOP Transaction***

94.     In or around 2015, EYP entered negotiations with architecture firm Stanley Beaman & Sears ("SBS") for EYP, leading to a merger and acquisition transaction. These discussions had been put temporarily on hold pending the close of the ESOP transaction.

95.     Shortly after June 28, 2016, EYP, through Birdsey, approached SBS to renew negotiations. EYP offered to purchase SBS for $3 million.  EYP informed SBS that it would pay a small amount of cash at closing, warrants, and $2.4 million in Group 2 notes.  Birdsey explained that it wanted to offer SBS a significant amount of notes so that the SBS equity owners had the "same opportunity that all EYP Principals were given at the ESOP transaction in exchange for their old EYP stock." Birdsey presented SBS with Long Point's valuation of EYP to convince SBS that the notes had a value of $2.4 million and that SBS would receive ongoing interest payments and the principal of these notes. At that time, Birdsey knew that EYP would not be able to pay the $2.4 million in notes and that the notes were not collectible.

96.     Birdsey worked on the acquisition of SBS in furtherance of the ongoing conspiracy with Starr, Watkins and Long Point, which still held a note senior to redemption, Group 1 and Group 2 noteholders.

***Fraudulent Concealment of Birdsey's and Long Point's Culpability***

97.     Since defrauding other constituents of EYP, on behalf of and in furtherance of the conspiracy among all Defendants, Birdsey, Starr, Long Point and Watkins have fraudulently and

actively concealed and covered up their wrongdoing through at least early 2020.

98.     In recent weeks, Plaintiffs uncovered business records of Long Point indicating its practice, when implementing its ESOP scheme, of planning to withhold material information from portfolio company employees by sharing only the number of shares that have been allocated to the employee through the ESOP and an annual valuation of those shares, and no other meaningful information. As a result, Long Point sets in motion a process that deprives minority stockholders who are employees of material financial and business information that would affect their decisions about buying or selling shares at all, from or to an ESOP.

99.     Birdsey and Long Point structured the ESOP transaction to retain their board positions, which enabled their cover up. In addition, Defendants structured the ESOP transaction as a buyback by EYP of stock, which it then resold to the ESOP, in order to have a superficial reason for withholding appraisal rights and disclosures under Delaware law for and to minority stockholders.

100.    Until early 2020, Birdsey and Starr repeatedly assured stockholders and noteholders that the ESOP only "enhanced" EYP's ability to pay, which was a materially false statement. The board falsely represented to multiple parties that the ESOP and its financing structure enhanced the company's resources, while withholding from other former stockholders that the notes EYP issued to them as part of the transaction were worth far less than face value. When doing so, the board omitted how the debt imposed on EYP made it virtually impossible for any subordinated debt to be satisfied in a remotely timely manner. In the course of inducing the Plaintiffs and those similarly situated to them to enter into note and subordination agreements surrounding the implementation of the ESOP, Birdsey, Starr, Scherr and Von Stroh omitted from disclosures the impact of onerous debt covenants that clearly could not be satisfied in even the

28

short term following the ESOP transaction. Indeed, EYP was in default of covenants from at or near the outset of the ESOP's launch.

101.    Since their implementation of the ESOP scheme through at least early 2020, on behalf of all Defendants and in furtherance of their conspiracy, Birdsey, Starr, Watkins and Long Point falsely touted the benefits of the ESOP structure while blaming the lack of payments to noteholders entirely on supposedly surprise performance issues. For example, on March 24, 2017, while he, Starr and Watkins remained board members, Birdsey wrote to noteholders, withholding material information about the onerous covenants, instead falsely stating: "Although formation of the ESOP *enhanced* our ability to make these covenant and tests and resulting payments, unfortunately the business results were such that the payments would have been disallowed either with or without the ESOP transaction."

102.    Prior to and including the end of calendar year 2017, Birdsey, Starr and Watkins evaded a growing number of questions from noteholders, often referring noteholders to each other and failing to provide accurate or complete answers. Also, when falsely touting benefits of the ESOP structure, Birdsey, Starr and Watkins failed to disclose their insistence on unrealistic projections underlying the valuations used in the sale to the ESOP, including the projections' dependence on steady business from SUNY Polytechnic Institute. The projections deviated from genuine management estimates, resulting in an inflated valuation providing cash to Long Point and Birdsey, but not for other constituents.

103.    Not until July 10, 2018 at the earliest did Birdsey or Long Point describe in any meaningful detail the impact of onerous covenants with the senior secured lender in a manner that would allow noteholders to understand the effect of the massive debts imposed as part of the ESOP transaction. Unknown previously to the Plaintiffs and other noteholders, the inability to

satisfy these specific covenants could make the notes payable to them worth far less than their face value.

104.    Birdsey, Starr, Watkins and Long Point also failed to disclose to other former stockholders and later noteholders the existence and amount of a valuation by the ESOP trustee, which fell at least $20 million below the valuations generated by the Long Point-led EYP board. The substance of this valuation remained hidden from minority stockholders and noteholders until restructuring work at EYP in or about early 2020. As reflected in information uncovered at that time, the conflicted ESOP trustee at GreatBanc quickly departed from the already-inflated valuation that had been provided to it, instead hastily and corruptly accepting an even higher value based on what Long Point sought.

105.    Birdsey, Starr, Von Stroh, Scherr, Watkins and Long Point also failed to disclose their reliance on valuations much higher than any independent valuation for an ESOP, which enabled them to justify more cash out the door to Long Point and for Birdsey's benefit, while imposing on other stockholders notes worth far less than their face value.

106.    The fraudulent nature of Birdsey's, Starr's, Watkin's, Von Stroh's, Scherr's and Long Point's wrongdoing and culpability came to light only in and since late 2018. On or about September 26, 2018, third-party consultant Terry Johnson revealed to one of the Plaintiffs the deep interest that Stantec had in an acquisition of EYP and the abrupt termination of those talks by Birdsey and Long Point.

107.    Other aspects of the Defendants' misconduct and scienter came to light in the course of restructuring work by new independent directors and outside service providers that occurred since the fall of 2019. Birdsey's, Starr's, Watkin's and Long Point's false, incomplete and misleading statements about these matters, while retaining board positions that enabled them

to hide their wrongdoing, amounted to fraudulent concealment of their wrongdoing.

108.    To avoid detection of their scheme, Birdsey and Long Point (through Starr, Von Stroh and Scherr), on behalf of all Defendants and in furtherance of their conspiracy, also concealed from minority stockholders Stantec's interest and efforts to acquire EYP, as well as the hasty termination of the talks. Birdsey, Starr and Watkins have made false statements and false denials to one or more noteholders, on behalf of themselves, each other and Long Point, suggesting that entities such as Stantec and/or other strategic suitors had not been viable candidates for acquiring EYP.

109.    As recently as in or about December 2017, Birdsey and Starr made false statements and false denials on behalf of Defendants and in furtherance of their conspiracy, specifically that EYP's defaults on covenants prevented payment on redemption, Group 1 and Group 2 notes had been technical and temporary in nature and on the verge of cure, without admitting the flaws underlying the selection and use of the ESOP structure. In reality, Stantec was a viable acquiror, and EYP's defaults on covenants had been substantial and, as a practical matter, not curable without a major restructuring at EYP.

110.    Between in or about 2018 through in or about February 2020, Birdsey and Starr (on behalf of each other and the other Defendants and in furtherance of their conspiracy) engaged in efforts to amend the terms of covenants with EYP's senior secured lender, without adequate disclosures to Plaintiffs and those similarly situated, in a manner designed to delay the inevitable enforcement of noteholders' rights against Defendants. Birdsey, Long Point, and Starr, on behalf of the Defendants and in furtherance of the conspiracy among the Defendants with whom they conspired, portrayed falsely to Plaintiffs and those similarly situated the surrounding circumstances as temporary delays on the verge of a cure, when in fact the financial problems

had mounted into the zone of insolvency.

111.    On July 18, 2020, Birdsey, Starr and Watkins continued and compounded their acts of fraudulent concealment. In a blast email by Birdsey, as Chairman of the board of directors, to most of EYP's noteholders. Birdsey made statements to noteholders designed to deflect responsibility away from him and Long Point by making it seem that he was in the same position as other noteholders and had not received benefits of any special funds at the implementation of the ESOP scheme at EYP. Specifically, he stated his goal was "to clear up any misinformation or misunderstandings about the 2016 ESOP Transaction," but instead concealed that he had received the benefit of a $2.7 million payment for his benefit and directed the recipients to "the flow of funds memorandum for the 2016 ESOP Transaction." That memorandum had omitted a description of the $2.7 million payment classified as a payment of Birdsey's tax liability. In a July 18, 2020 email, Birdsey copied, among others, EYP's board of directors, including Starr and Watkins. Despite their ongoing fiduciary duties, including to noteholders as EYP has given notice that it is in the zone of insolvency, Starr and Watkins did not correct Birdsey's false and misleading email.

112.    In a further act of fraudulent concealment, which remains ongoing, Defendants have not made board minutes for EYP, from in or about 2015 through in or about August 2016, available to EYP or Plaintiffs.

113.    In sum, from no later than in or about 2015, through the present, Defendants knowingly and willfully conspired with each other and others, in the Southern District of New York and elsewhere, to defraud and exploit EYP's minority stockholders in connection with the ESOP scheme, redemption notes, Group 1 notes and Group 2 notes; to breach and aid and abet breaches of fiduciary duties owed to minority stockholders and, since EYP entered the zone of

insolvency, creditors, including redemption, Group 1, and Group 2 noteholders; and to fraudulently conceal and cover up Defendants' wrongdoing. Each of the Defendants took overt acts in furtherance of the conspiracy, as described above. None of the Defendants has made any effort to withdraw from the conspiracy, as they continue to act jointly, concealing and covering up their wrongdoing despite Birdsey's, Starr's and Watkin's ongoing duties to disclose the omitted material facts as members of EYP's board of directors.

***The Noteholders' Notes***

114.    Getting more than $40 million in cash to Long Point and $2.7 million in a payment for the benefit of Birdsey required not only causing EYP to incur substantial bank debt, but also to convince then-minority stockholders to accept notes from EYP instead of cash as payment for their stock. In connection with the ESOP scheme at EYP, Long Point and Birdsey developed three categories of notes: (1) "redemption" notes for those already retired or retiring at the time, generally carrying a maturity date in or about December 2021; (2) "Group 1" notes for those existing employees planning an imminent retirement by approximately 2019, generally (but with exception) carrying a maturity date in 2051; and (3) further subordinated "Group 2" notes for then-existing employees who did not have imminent retirement plans, also carrying a maturity date of 2051.

115.    Birdsey's and Long Point's conspiracy dramatically impacted each of the Plaintiffs and other noteholders who depended on proceeds from the sale of stock for their retirement.

116.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, as the administrator of the estate of her late husband, Ed Kohlberg, Plaintiff Kohlberg holds an amended note dated June 28, 2016 on which she remains owed $3,330,377.21 plus interest. As

Ed Kohlberg had retired and died the prior year, at about the time of the ESOP transaction, EYP owed to Kohlberg an installment payment in excess of $2 million. Birdsey personally pressured Kohlberg into amending the note issued in 2015, in a manner that cut the payment due in approximately half, deferring the remainder for another year. Neither that deferred payment nor any other payment since that time has been made to Kohlberg.

117.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, Eijadi holds redemption notes dated June 28, 2016 in the amount of $985,475.86 plus interest. He sought to retire prior to the ESOP.

118.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, Jurkowski holds redemption notes with five-year maturity terms, one initially issued on March 18, 2016 and amended on June 28, 2016 in the amount of $166,952.01, and another dated June 10, 2016 in the amount of $164,343.15, on which a principal payment of $55,650.67 has been made, leaving a balance of approximately $275,644.51 plus interest.

119.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, Lassor holds a Group 1 note dated June 28, 2016 in the amount of $1,615,667.30 plus interest, as amended to confirm a five-year maturity date.

120.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, McDougall holds a redemption note initially issued in 2015 in the amount of $248,638.67 for which $165,759 remains outstanding and a Group 1 note dated June 28, 2016 in the amount of $5,870,735.98, plus interest.

121.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, Ottavio holds a Group 1 note dated June 28, 2016, in the amount of $4,790,584.37 plus interest.

122.    As a direct and proximate result of the Defendants' ESOP scheme at EYP,

Steinbock holds a Group 2 note dated June 28, 2016 in the outstanding amount of $951,172.96 plus interest, with a maturity date of on or about June 28, 2051.

123.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, Sears holds a Group 2 note dated December 30, 2016, in the amount of $760,148.06 plus interest.

124.    At this time, Plaintiffs' notes are uncollectible. Defendants caused the notes to be subordinated to senior secured debt and further notes owed to Long Point. As a result, EYP has not made any payments on these notes since the implementation of the ESOP scheme at EYP.

125.    These Plaintiffs and other noteholders and employees of EYP experienced intense pressure that management placed on them to sign onto the notes, each being convinced that they could hurt other employees and minority stockholders by not agreeing to the notes' terms. None of the Plaintiffs or other noteholders was provided with adequate details on the ESOP transaction, prior to the time they had to vote on whether to approve the ESOP, to understand the extent to which Birdsey and Long Point were exploiting them. Birdsey and Long Point also repeatedly gave false assurances about the enhancements that the ESOP created at EYP, while failing to disclose facts that made the debts uncollectable post-ESOP transaction.

126.    Each of the Plaintiffs expected to enjoy retirement with his or her earned nest egg. Instead, the scheme to defraud them has caused substantial stress and financial damage to each of them in at least the face amount of the notes plus interest. In total, the named Plaintiffs alone are owed approximately $20 million with interest.

127.    Plaintiffs are parties to a tolling agreement that excludes from any applicable statute of limitations or repose the period from the start of tolling from Coronavirus-related court shutdowns through and including August 15, 2020.

*Motive and Opportunity*

128.    Long Point engaged in its fraudulent ESOP scheme motivated by cash, specifically a disproportionate $44 million that its affiliates could obtain from the transaction that exploited minority stockholders. Birdsey's motivation included his desire to receive the benefit of $2.7 million cash and assignment of Group 1 rather than Group 2 notes. Watkins' motivation included his desire to receive Group 1 rather than Group 2 notes, as well as to ingratiate himself further with Birdsey for other compensation purposes.

129.    All of Birdsey, Long Point, Starr, Von Stroh, Scherr and Watkins had the opportunity to structure the ESOP scheme and related transactions to benefit themselves with full access to EYP's financial information and insight into the investigation and prosecution of one of EYP's largest and most profitable clients, which minority stockholders lacked. Long Point further created an opportunity to exploit minority stockholders by sharing one of its outside counsel, Ropes & Gray, with EYP, and sharing another outside counsel, K&L Gates, with GreatBanc. These insider relationships facilitated the corruption of EYP's directors and advisors, while cloaking incriminating communications in a superficial claim of attorney-client privilege.

*Class Action Allegations*

130.    Plaintiffs bring this action on their own behalf and as a class action on behalf of all present redemption noteholders, Group 1 noteholders and Group 2 noteholders of EYP who did not culpably participate in the disloyal creation and implementation of the Defendants' ESOP scheme at EYP (the "Class"). Upon information and belief, all such noteholders have held their interests as a result of the Defendants' fraud and at a time when one or more of the Defendants breached their fiduciary duties to minority stockholders of EYP in 2016 or more recently to them as noteholders.

131.    Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants, and any other noteholders who culpably participated in the development of the ESOP scheme.

132.    This action is properly maintainable as a class action.

133.    The Class is sufficiently numerous that joinder of all members is impracticable. There are likely more than 75 noteholders in the Class.

134.    There are questions of law and fact that are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, among other things, the following:

(a)     Whether as a controlling stockholder Long Point and its affiliates, and the directors on the board and officers Long Point controlled breached their fiduciary duties in connection with the board's implementation of the ESOP scheme at EYP;

(b)     Whether the controlling stockholder Long Point and its affiliates aided and abetted the directors' breaches of their fiduciary duties in connection with the board's implementation of the ESOP scheme at EYP;

(c)     Whether Defendants acted with scienter; and

(d)     Whether the Defendants can show the fairness of the totality of the transactions under Delaware's entire-fairness doctrine, or the extent to which they must return to Plaintiffs and similarly situated stockholders the proceeds they received from ESOP scheme.

135.    Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs do not have any interests adverse to the Class.

136. Plaintiffs are adequate representatives of the Class, have been involved with EYP sufficiently to know its business, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

137. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the Defendants.

138. Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

139. Defendants have acted in a manner generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## DERIVATIVE ALLEGATIONS

140. A portion of the claims and damages in this matter may be deemed to arise, in the alternative, from rights of EYP rather than rights of the Plaintiffs and other stockholders directly. Plaintiffs therefore bring this action in the alternative derivatively to redress injuries suffered by EYP as a direct result of the conspiracy among, and the fraud and breaches of fiduciary duties by, the Defendants.

141. Plaintiffs have owned EYP stock during the wrongful course of conduct by Defendants alleged herein, or held and continue to hold notes as creditors while EYP reports that it is in the zone of insolvency.

142.    Plaintiffs will adequately and fairly represent the interests of EYP and its stockholders and creditors in enforcing and prosecuting their rights and have retained counsel competent and experienced in such matters.

## DEMAND ON THE BOARD IS EXCUSED AS FUTILE

143.    Plaintiffs have not made a demand on the EYP board of directors to bring suit asserting the claims set forth herein because pre-suit demand would be futile and is excused as a matter of law.

144.    Defendant Birdsey remains Chairman of EYP's board of directors. Starr and Watkins remain members of EYP's board of directors. They are interested and conflicted in any assessment of the claims herein. The other members of EYP's board of directors are conflicted because of accusations made by Birdsey, Starr and Watkins against them in a pending lawsuit in Delaware Chancery Court. Birdsey, Starr and Watkins have accused other directors of participating in forged board minutes and/or resolutions, and then acting without proper authority. Simply put, EYP's board of directors is too conflicted and dysfunctional about the very issues in this action to make an informed and fair assessment of the claims herein.

145.    The ESOP transaction consisted plainly of interested transactions on terms that were unfair to EYP's constituents other than the Defendants. Because those related transactions were interested transactions, the Defendants will bear the burden of proving the entire fairness of them.

146.    Further, because the ESOP transaction served Defendants disproportionately and was unfair to EYP, and its terms inexplicable except on grounds of bad faith or a lack of independence, it cannot be deemed a product of the valid exercise of business judgment, and demand is excused as a matter of law.

**Count One**
(Securities Fraud Against Birdsey, Long Point, Long Point Fund II, and Long Point Fund III)

147.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

148.    In connection with their ESOP scheme at EYP and/or issuance of redemption, Group 1 and Group 2 notes, each of the Defendants participated in the purchase and sale of securities within the meaning of federal securities laws.

149.    The Defendants implemented ESOP transactions at EYP as a scheme and artifice to defraud Plaintiffs and others similarly situated in connection with the purchase and sale of EYP's securities, including stock and notes.

150.    In connection with the purchase and sale of securities, Defendants made and caused to be made material misrepresentations and omissions to Plaintiffs and those similarly situated, including inflated projections for valuations designed to make it appear that EYP was sufficiently valuable for Long Point's affiliates to receive $44 million in cash. For example, when providing information for valuations that informed pricing of the securities in a process on which Plaintiffs and others similarly situated relied, Defendants omitted material information from that disclosed to Plaintiffs and others similarly situated concerning their knowledge that highly-profitable business from SUNY Polytechnic Institute had been improperly obtained and would likely decline substantially or disappear (which it did). Also in connection with the purchase and sale of EYP's securities, Defendants failed to disclose to Plaintiffs and those similarly situated material information about Stantec's interest in a strategic transaction that likely would have generated greater value for EYP's stockholders as a whole. Furthermore, Defendants failed to disclose to Plaintiffs and those similarly situated material information concerning Long Point's relationship with and the corruption of GreatBanc, as described above.

151.    Defendants made these material misrepresentations and omissions with scienter, intentionally and with a severely reckless disregard for the truth, to induce Plaintiffs and those similarly situated to sell their stock and to enter into the redemption, Group 1 and Group 2 notes at issue.

152.    Plaintiffs and those similarly situated reasonably relied on the material misrepresentations and omissions by Defendants.

153.    None of the Plaintiffs could discover the fraud and Defendants' scienter until one of them learned in or about September 2018 about Stantec's interest in purchasing EYP and the termination of those discussions. The remainder of the Plaintiffs could not discover Defendants' fraud until restructuring and internal investigative efforts at EYP took place in early 2020. As described above, Defendants have fraudulently concealed and covered up their wrongdoing through recent false and misleading communications in 2020.

154.    As a direct and proximate cause of the Defendants' misrepresentations and omissions, Plaintiffs and those similarly situated lost the value of their stock and the principal and interest on their notes, and suffered other losses caused by Defendants' fraud.

**Count Two**
(Breach of Fiduciary Duty of Loyalty Against Birdsey, Long Point, Long Point Fund II,
Long Point Fund III, Starr, Scherr, Von Stroh and Watkins)

155.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

156.    At the relevant times, each of the Defendants herein owed fiduciary duties to Plaintiffs and those similarly situated, including the duties of undivided loyalty, care, and obedience. In or about 2015 through on or about June 28, 2016, Defendants owed such fiduciary duties in favor of Plaintiffs and the other minority stockholders, and since in or about June 2016

to Plaintiffs and other creditors after EYP entered the zone of insolvency.

157.    Each of the Defendants willfully breached their duties of loyalty in connection with the controlling stockholder group-initiated ESOP transaction. As described above, they breached their *Revlon* and other fiduciary duties by failing to pursue Stantec's offer and, instead, implementing the ESOP scheme without a fair process or price.

158.    Since that time, Defendants have actively and fraudulently concealed and covered up their breaches, as described above, despite Birdsey, Starr and Watkins having ongoing duties to disclose such matters as members of EYP's board of directors.

159.    As a direct and proximate result of Defendants' breaches of fiduciary duties of loyalty, Plaintiffs and those similarly situated have been damaged by at least the value of outstanding principal and interest on the redemption, Group 1 and Group 2 notes that they hold.

**Count Three**
(Fraud Against all Defendants)

160.    Plaintiff repeat and incorporate each of their prior allegations as if repeated in full herein.

161.    Defendants made material misrepresentations and omissions to Plaintiffs and those similarly situated, including inflated projections for valuations designed to make it appear that EYP was sufficiently valuable for Long Point's affiliates to receive $44 million in cash and Birdsey to receive the benefit of a $2.7 million payment for him, classified as an estimated tax payment, while making the notes to Plaintiffs and those similarly situated uncollectible. Birdsey, Starr and Watkins caused similar misrepresentations to be made to SBS and Sears for the purchase of SBS.

162.    When providing information for valuations that informed pricing of the securities in a process on which Plaintiffs and others similarly situated relied, Defendants omitted material

information from what they disclosed to Plaintiffs and others similarly situated concerning their knowledge that highly-profitable business from SUNY Polytechnic Institute would likely decline or disappear. Also in connection with the purchase and sale of EYP's securities, Defendants failed to disclose to Plaintiffs and those similarly situated material information about Stantec's interest in a strategic transaction that would have likely generated greater value for EYP's stockholders as a whole. Furthermore, Defendants failed to disclose to Plaintiffs and those similarly situated material information concerning Long Point's relationship with GreatBanc, as described above.

163.    Defendants made these material misrepresentations and omissions intentionally and with a reckless disregard for the truth, to induce Plaintiffs and those similarly situated to sell their stock and enter into the redemption, Group 1 and Group 2 notes at issue.

164.    Plaintiffs and those similarly situated reasonably relied on the material misrepresentations and omissions by Defendants.

165.    None of the Plaintiffs could discover the fraud until one of them learned in September 2018 about Stantec's interest in purchasing EYP. The remainder of the Plaintiffs could not discover Defendants' fraud until restructuring and internal investigative efforts at EYP took place in early 2020. As described above, Defendants have fraudulently concealed and covered up their wrongdoing through recent false and misleading communications in 2020.

166.    As a direct and proximate cause of their reliance on Defendants' misrepresentations and omissions, Plaintiffs and those similarly situated lost the value of the principal and interest on their notes and suffered other losses caused by Defendants' fraud, for which Defendants are liable.

167.    Defendants acted with a deliberate, reckless, and criminal indifference to the

fundamental rights of Plaintiffs and those similarly situated, thereby entitling Plaintiffs to an award of punitive damages.

## Count Four
(Conspiracy Against All Defendants)

168.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

169.    From in or about 2015 through the present, each of the Defendants knowingly and intentionally combined, conspired and agreed, with each other and others, to defraud Plaintiffs and those similarly situated, to breach fiduciary duties owed to them, to aid and abet breaches of fiduciary duty and to conceal and cover up their wrongdoing.

170.    As described in more detail above, each of the Defendants committed overt acts in furtherance of the conspiracy and reasonably foreseeable to each other, including by approving the ESOP transaction with disparate consideration diverted to Long Point and Birdsey.

171.    Defendants are directly and vicariously liable to Plaintiffs and those similarly situated for the damages directly and proximately caused by the wrongdoing of Defendants.

172.    Defendants acted with a deliberate, reckless, and criminal indifference to the fundamental rights of Plaintiffs and those similarly situated, thereby entitling Plaintiffs to an award of punitive damages.

## Count Five
(Unjust Enrichment Against All Defendants)

173.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

174.    Each of the Defendants has been enriched at the expense of Plaintiffs and those similarly situated.

44

175.    It is against equity and good conscience to permit Defendants to retain what is sought to be recovered. Defendants have been unjustly enriched at the expense and exploitation of Plaintiffs and those similarly situated.

176.    Plaintiffs and those similarly situated are entitled to restitution or rescissory damages in connection with the ESOP scheme.

**Count Six**
(Constructive Fraudulent Conveyance Against Long Point Fund III,
Starr, Birdsey and GreatBanc)

177.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

178.    At the time of the implementation of Defendants' ESOP scheme, in or about June 2016, Defendants caused transfers of approximately $44 million worth of assets and property from EYP to Long Point, and approximately $2.7 million worth of assets from EYP to and/or for the benefit of Birdsey, for no meaningful consideration to EYP.

179.    These conveyances to Long Point and Birdsey, in part through GreatBanc, rendered EYP insolvent or left it with small capital such that it would be unable, if required, to pay its debt pursuant to the redemption, Group 1, or Group 2 notes.

180.    When controlling EYP's board of directors at the time of these conveyances, Long Point, Starr, and Birdsey knew and believed that EYP would incur debts beyond its ability to pay.

181.    As the ESOP trustee with access to significantly lower valuations, GreatBanc knew and believed that EYP would incur debts beyond its ability to pay.

182.    As creditors of EYP, which in turn is in the zone of insolvency, Plaintiffs and those similarly situated are entitled to restitution of the conveyances for their benefit.

**Count Seven**
(Intentional Fraudulent Conveyance Against Long Point Fund III, Birdsey and GreatBanc)

183.     Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

184.     At the time of the implementation of Defendants' ESOP scheme, in or about June 2016, Defendants caused transfers of approximately $44 million worth of assets and property from EYP to Long Point, and approximately $2.7 million worth of assets from EYP to or for the benefit of Birdsey, for no meaningful consideration to EYP.

185.     Long Point and Birdsey intended or recklessly disregarded the fact that EYP lacked prospects for any stockholder other than Long Point's affiliates being paid in substantial part for its stock. Birdsey also intentionally took the benefit of a $2.7 million payment at closing that was a unique benefit in connection with his efforts that helped Long Point's affiliates receive approximately $44 million in cash.

186.     These conveyances to Long Point and Birdsey rendered EYP insolvent or left it with small capital such that it would be unable to satisfy, when required, its debt pursuant to the redemption, Group 1, or Group 2 notes.

187.     When controlling EYP's board of directors at the time of these conveyances, Birdsey and Long Point knew and believed that EYP would incur debts beyond its ability to pay. Long Point, Starr, Birdsey and GreatBanc acted with intent to defraud EYP's present and future creditors.

188.     As creditors of EYP, which in turn is in the zone of insolvency, Plaintiffs and those similarly situated are entitled to restitution of the conveyances for their benefit.

**Count Eight**
(Reformation Subordinating Long Point, Starr, Birdsey and Watkins/Constructive Trust)

189.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

190.    Long Point, its affiliates, Starr, Birdsey and Watkins have engaged in fraud targeting Plaintiffs and others similarly situated, resulting in EYP reporting itself in the zone of insolvency.

191.    Long Point and Birdsey have claimed a priority right over various categories of noteholders.

192.    At the time of Defendants' fraudulent ESOP scheme, in or around June 2016, Long Point, Starr, Birdsey and Watkins owed fiduciary duties to Plaintiffs and those similarly situated.

193.    Based on the fraud perpetrated by Long Point, its affiliates, Birdsey, Starr and Watkins, and/or Plaintiffs' unilateral mistakes caused by Long Point and Birdsey about the value of EYP's stock in the transaction with the ESOP, equity and good conscience require a declaration of reformation of the parties' rights, subordinating the rights of Long Point, Starr, Birdsey and Watkins below those of all of the redemption, Group 1 and Group 2 noteholders.

194.    In the alternative, a constructive trust should be declared and imposed on Long Point and Birdsey to require both of them to hold all funds received from EYP in a constructive trust for the benefit of Plaintiffs and others similarly situated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1. That the Court certify the class and approve Plaintiffs as named representatives of the class, and the undersigned as lead counsel;

2. In the alternative, that the Court allow Plaintiffs to bring their claims derivatively on behalf of EYP;

3. That the Court enter judgment in favor of Plaintiffs and those similarly situated on all claims set forth in its Complaint, awarding just and fair damages and monetary relief on Counts One through Six, for the wrongdoing that Defendants inflicted upon them, and the declaratory and equitable relief requested on Count Seven;

4. that the Court award to Plaintiffs their attorneys' fees, costs, expenses, and pre-judgment and post-judgment interest;

5. that the Court award to Plaintiffs any and all further and other relief to which it may be entitled at law or in equity.

Dated:  August 7, 2020                  Respectfully submitted,

PLAINTIFFS KOHLBERG, EIJADI,
McDOUGALL, LASSOR, OTTAVIO,
JURKOWSKI, and STEINBOCK

By their attorneys,

/s/Barry S. Pollack
Barry S. Pollack
Phillip Rakhunov
POLLACK SOLOMON DUFFY LLP
737 Third Ave., 32nd Floor
New York, NY 10017
212-493-3100 (Tel)
617-960-0490 (Fax)
bpollack@psdfirm.com

PLAINTIFF SEARS,

By her attorneys,

/s/Anne K. Bowling
Anne K. Bowling
RUPP BAASE PFALZGRAF CUNNINGHAM, LLC
1600 Liberty Building
Buffalo, NY  14202
716-854-3400 (Tel)
716-332-0336 (Fax)
bowling@ruppbaase.com