USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: __3/31/2022__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARJORIE KOHLBERG, ET AL.,

                Plaintiffs,

-against-

TOM BIRDSEY, ET AL.,

                Defendants.

20-cv-6250 (ALC)

**OPINION & ORDER**

**ANDREW L. CARTER, United States District Judge:**

      This matter concerns the negotiations leading up to and the aftermath of a firm's Employment Stock Ownership Plan ("ESOP"). Plaintiffs, Marjorie Kohlberg, David Eijadi, Thomas McDougall, Peter Ottavio, Melissa Lassor, Mary Lou Jurkowski, Jason Steinbock, and Betsy Sears, bring suit against Defendants David Watkins,[1] Tom Birdsey, Ira Starr, Norman Scherr, Eric Von Stroh, Greatbanc Trust Company ("Greatbanc"), Long Point Capital, Inc. ("LPC"),[2] EYP Holdings, Inc. and EYP Group Holdings (collectively, "EYP"). Plaintiffs allege securities fraud and various common law torts.[3]

## BACKGROUND

**A. Factual Background.**

      EYP Holdings, Inc. and EYP Group Holdings (collectively, "EYP") provide architectural and engineering services through various affiliates. EYP, founded in 1972, was a highly regarded in the field. Defendant Birdsey served as Chairman and CEO of EYP Holdings from 2005

---

[1] Defendant Watkins was terminated on May 24, 2021.
[2] LPC refers to Defendant Long Point Capital, Inc. as well as Defendants Long Point Capital Fund II. L.P., Long Point Capital Partners II, L.P., Long Point Capital Fund III, L.P., and Long Point Capital Partners III, L.P.
[3] Neither Plaintiff's Third Amended Complaint ("TAC") nor its voluminous opposition papers expressly state under which statute they bring their securities fraud claims. Like Defendants, the Court assumes Plaintiff's securities fraud claim is brought pursuant Rule10b-5 of the Securities Act of 1934 as Count One of the TAC appears to list the requirements of this claims. *See* TAC ¶¶ 182–89.

through 2018.  In 2011, Long Point Capital ("LPC"), a private equity firm, through its affiliates Long Point Capital Fund II and Long Point Capital Fund III, acquired a 3 percent stake in EYP Holdings for $9 million.  This stake gave LPC the right to appoint three of the five members of EYP's board.

Plaintiffs Eijadi, Kohlberg, McDougall, and Jurkowski hold redemption notes.  Plaintiffs McDougall, Ottavio, and Lassor hold Group 1 notes.  Plaintiffs Steinbock and Sears hold Group 2 notes.  The three categories of notes:

> (1) "redemption" notes for those already retired or in the process of retiring, generally carrying a maturity date in 2021;
> (2) "Group 1" notes generally for those planning an imminent retirement, and generally carrying a maturity date in 2051; and
> (3) further subordinated "Group 2" notes for then-existing employees who did not have imminent retirement plans, also carrying a maturity date of 2051.

TAC ¶ 19.  Defendants Starr, Scherr, and Von Stroh were all directors of EYP during the period relevant to this suit.

***Restructuring in the Industry***

Between 2015 and 2016, the architectural industry began contracting resulting in a series of mergers and acquisitions.  EYP was no different.  In 2015, EYP hired Houlihan Lokey to act as financial advisor to explore a possible sale of the firm.  Houlihan championed the benefits of a sale, which they believed would attract multiple prospects given EYP's reputation.  By February 2015, Houlihan had compiled a shortlist of potential buyers.  This list included Stantec, a publicly-traded competitor.  Through a consultant, EYP began acquisition discussions with Stantec around September 2015.  Although Stantec demonstrated considerable interest in a potential acquisition, EYP decided not to follow up on the prospect of a Stantec acquisition.  Plaintiffs allege that Birdsey and LPC had a substantial involvement in this decision.

*Valuation for Purposes of Kohlberg Estate Transaction*

Defendant Birdsey shared management responsibilities with Ed Kohlberg, who passed away on October 17, 2015. Shortly before his death, Birdsey led negotiations to purchase Kohlberg's stock at a valuation of $2,700 per share. Plaintiffs allege that only months later the ESOP valuation would result in a per share price of $5,100.

*The ESOP, Tax Payment to Birdsey, and LPC Buyout*

In June 2016, EYP management proposed an Employee Stock Ownership Trust (the "Trust"). Through the trust, EYP's employees would have a 100% ownership of the firm. To accomplish this, EYP initiated an Employee Stock Ownership Plan ("ESOP"), which entailed buying stockholder shares in exchange for notes in the Trust. EYP, with input from LPC, hired Defendant GreatBanc as a financial advisor responsible for the valuation of EYP in connection with the ESOP transaction. In this position, GreatBanc acted as fiduciary to the ESOP.

In June 2016, Plaintiffs allege that Defendant Birdsey and LPC convinced EYP employees "who own[ed] equity to sell their stock to an . . . ESOP," in exchange for notes. TAC ¶ 1. Plaintiffs further allege that this process resulted in LPC receiving a windfall of cash, which they allege resulted in a 500% return on LPC's investment. They also allege that LPC "caused EYP to make a unique payment of approximately $2.7 million for the benefit of Birdsey, classified as an estimated tax payment, at the time of the ESOP's launch." TAC ¶ 90.

In the order to pay the cash offer, EYP borrowed over $40 million dollars. Plaintiffs allege that the buyout price was based on an inflated valuation of EYP. Plaintiffs believe Defendants "knowingly and improperly used or relied on inflated revenue and profit data, excessive multiples of EBIDTA for an ESOP transaction and/or entities or transactions as

comparables that improperly took synergies into consideration, which should not have been factored into a valuation for an ESOP transaction." TAC ¶ 54.

### *The SUNY Polytechnic Project*

In 2015, Birdsey began discussions with SUNY Polytechnic Institute for a future project worth an estimated $40 million. In mid-2015, Birdsey met with Alain Kaloyeros, then-President of SUNY Polytechnic. Birdsey and Kaloyeros discussed future business between SUNY and EYP. Following the meeting, an EYP employee who attended the meeting spoke to Birdsey about the conversation alluding to "illegitimate no-bid contract." Birdsey allegedly responded by affirming the nature of the conversation and explained that he and Kaloyeros had a "special relationship." Following this discussion, Plaintiffs allege that Birdsey banned this employee from working on matters involving SUNY or Kaloyeros.

Around March 2016, this employee attended a meeting with Birdsey, Defendant Starr, and Defendant Watkins. Birdsey instructed the EYP strategist to present a description of EYP's business and to include the $40 million SUNY project. The strategist allegedly objected to the inclusion of the SUNY contract, stating that it would inflate revenue and profits since the project was not yet under contract. Birdsey insisted on its inclusion, and Starr did not object. As the meeting progressed, an outside consultant working on the ESOP valuation joined the attendees. Plaintiffs allege Birdsey continued to present the SUNY project as if it were under contract. They allege these representations contributed to the inflated ESOP valuation.

In 2015, SUNY was the subject of state and federal criminal investigations into illegal bid rigging activity. In 2018, Kaloyeros was convicted of federal charges related to this bid rigging activity. In the indictment, federal prosecutors named Architect-1 as an unidentified co-conspirator with Kaloyeros. Plaintiffs allege that Architect-1 is Defendant Birdsey. Plaintiffs

4

believe LPC and Birdsey had some knowledge of this investigation. They allege that at some point in 2016 LPC learned about an FBI raid, but neither LPC nor Birdsey informed Plaintiffs and other minority shareholders about the frailty of the SUNY project.

### *Dealings with Stanley Beaman & Sears*

In addition to fielding offers for a prospective sale of the firm in 2015, EYP also engaged in discussions to acquire competitors. In 2015, EYP began negotiations with Stanley Beaman & Sears ("SBS"), an architecture firm. These discussions were put on hold pending the outcome of EYP's ESOP transaction. In June 2016, Birdsey resumed negotiations with SBS on behalf of EYP. EYP offered to purchase SBS for $3 million. This sum was to be paid with cash, warrants and $2.4 million in Group 2 notes. Plaintiffs allege that Birdsey told SBS that it was being offered a substantial amount in Group 2 notes so that SBS equity owners would have "the same opportunity that all EYP Principals were given at the ESOP transaction in exchange for their old EYP stock." TAC ¶ 114. The SBS acquisition was based on the same valuation used in the ESOP.

### *EYP's Post-ESOP Performance*

Following the ESOP agreement, EYP's performance in the industry declined. The decline led to the devaluation of the firm and consequently the devaluation of the notes issued by the Trust. Plaintiffs claim the valuation of EYP stock for the purposes of the LPC cash payout was fraudulent and the buyout saddled EYP with a debt it could not service, rendering the firm "effectively insolvent." Plaintiffs also allege that EYP was in default of covenants and insolvent from at or near the outset of eth ESOP's launch." TAC ¶ 120.

**B. The Transactions at Issue**

Plaintiffs take issue with these six transactions described above:

(1) the payment to Ed Kohlberg in exchange for his shares;

(2) the loans EYP borrowed to fund the ESOP transaction;

(3) the payment to LPC in exchanged for its EYP stock;

(4) the tax payment to Defendant Birdsey in connection to the ESOP transaction;

(5) the notes given to EYP employees in exchange for their EYP shares; and

(6) the notes issued to SBS as part of the EYP's acquisition of the firm.

## LEGAL STANDARDS

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  When ruling on a Rule (12)(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and "draw all reasonable inferences in [plaintiff's] favor." *See, e.g.*, *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

## DISCUSSION

### A. Federal Securities Fraud

When a plaintiff has alleged fraud claims under § 10(b) of the Exchange Act, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or

6

mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 187 (2d Cir. 2004) (citation and internal quotation marks omitted).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "(2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citations and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### *Plaintiffs' Allegations Lack the Particularity Required Under Rule 9(b)*

The TAC eschews specificity for the recitation of general grievances and legal conclusions. The TAC alleges that *some* defendants made *some* statements at various instances in a six-year period and that Defendants failed to disclose information to minority stockholders which would have been material to the decisions of whether to move forward with the ESOP. The TAC attempts to plead its case with general allusions to misstatements or omissions,

The TAC makes various allegations of alleged misstatements and omissions:

- Defendants caused and adopted material overstatements of contractual revenue, profits and projections for business related to SUNY Polytechnic Institute, in light of Birdsey's, Starr's, Long Point's and Watkin's knowledge that substantial business from SUNY Polytechnic Institute had been illegitimately obtained or had not yet been awarded and

7

- was jeopardized given its being the subject of a joint state and federal criminal investigation. TAC ¶ 74.
- [O]n or about November 17, 2015, Defendants Birdsey and Watkins identified themselves as the first two leaders of the firm to sign onto this commitment and induced several other senior practice leaders to commit to an ESOP buyout. Defendants Birdsey and Watkins thereby induced several of the Plaintiffs to trust them in their launch of an ESOP, and to cause other Plaintiffs and those similarly situated to trust them as well. TAC ¶ 109.
- In or about early spring 2016, Defendants Birdsey and Watkins led a small group conference call to promote the ESOP to certain stockholders of EYP. During the call, Watkins encouraged other participants to downplay to other EYP employees and stockholders the onerousness of agreements they would be asked to sign. TAC ¶ 111.
- Despite their knowledge that Long Point had used an inflated valuation, Birdsey, CFO Kempf, and EYP's consultant Modicum presented SBS with Defendants' materially false valuation of EYP to convince SBS that the notes had a value of $2.4 million and that SBS would receive ongoing interest payments and the principal on these notes. At that time, Birdsey knew that EYP would not be able to pay the $2.4 million in notes and that the notes were not collectible. TAC ¶ 114.

These statements are exemplary of the TAC's conclusory allegations and are insufficient under Rule 9(b). The TAC often refers to Defendants' failure to disclose or alludes to misstatements. Yet, the TAC does not identify specific speakers, or specific dates, or bring to bear any other facts to support a finding of fraud.

### *The Third Amended Complaint Impermissibly Relies on Group Pleading*

A plaintiff need not identify an individual source of statements when "the fraud allegations [must] arise from misstatements or omissions in group-published documents (e.g., prospectuses) that reflect the collective actions of various individuals directly involved in the day-to-day affairs of the corporation." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 220 (S.D.N.Y. 2004). But Much of the TAC attributes statements or omissions to a group of defendants:

- Long Point, Birdsey, Starr and Watkins knew that Group 2 noteholders would not get paid, or recklessly disregarded the likelihood that they would not get paid, the full value of their notes. TAC ¶ 100.

8

- [A]lso until in or about February 2021, continued to provide materially false information, and to withhold and conceal information from Plaintiffs despite their ongoing fiduciary duties.  TAC ¶ 118.
- Defendants intentionally failed to inform Plaintiffs that the 2016 valuations were based on inflated revenue and profits, including amounts attributable to SUNY Polytechnic projects that were not real or reliable, but instead either did not exist or were jeopardized entirely by criminal investigations, and that the stock price used to calculate Long Point's buyout and note values was over-inflated and did not reflect the true value or projected value of the company.  TAC ¶ 121.
- Defendants continued to express optimism about the future prospects of EYP.  TAC ¶ 124.
- Birdsey, Starr, Von Stroh, Scherr, Watkins and Long Point also failed to disclose their reliance on valuations much higher than any independent valuation for an ESOP, which enabled them to justify more cash out the door to Long Point and for Birdsey's benefit, while imposing on other stockholders notes worth far less than their face value.  TAC ¶ 126.

Yet, Plaintiffs here have not pleaded that any group-published documents contained a misstatement or omission.  As such, the Court cannot consider Plaintiffs' allegations that aren't attributed to an individual source.

### *Statements Attributed to Birdsey Lack Specificity*

Among its many pages, the TAC appears to lean heavily on the circumstances surrounding the SUNY project and the valuation of EYP stock for purposes of the ESOP. Plaintiffs contend that Defendants should have disclosed information regarding the SUNY project.  They argue that the SUNY project contributed to the erroneously high valuation of the firm, and Defendants knew that the deal was obtained via a no bid process, violating New York law.  The TAC attributes various statements regarding SUNY and the ESOP to Defendant Birdsey:

- Birdsey instructed the senior strategist to present to the outside consultant a description of business underlying a $40 million contract for a project related to SUNY Polytechnic. . . . Birdsey presented the project falsely as if under contract, when it was not, with Starr also participating in the meeting.  TAC ¶ 83.
- Birdsey again gave instructions to the senior strategist who accompanied him to meetings with Kaloyeros and an outside consultant working on a stock valuation for the ESOP

- launch, warning the EYP employee not to say anything to anyone about those meetings and related topics.  TAC ¶ 123.
- In a blast email . . . , Birdsey made statements to noteholders designed to deflect responsibility away from him and Long Point . . . . [H]e stated his goal was "to clear up any misinformation or misunderstandings about the 2016 ESOP Transaction," but instead concealed that he had received the benefit of a $2.7 million payment for his benefit and directed the recipients to "the flow of funds memorandum for the 2016 ESOP Transaction." That memorandum had omitted a description of the $2.7 million payment classified as a payment of Birdsey's tax liability.  TAC ¶ 133.
- Birdsey personally pressured Kohlberg into amending the note issued in 2015, in a manner that cut the payment due in approximately half, deferring the remainder for another year. In the weeks leading up to this modification, Defendant Birdsey contacted Kohlberg directly to induce her into trusting him about the ESOP launch, which he did in part by misrepresenting to her that her late husband Ed had supported the plan.  TAC ¶ 144.

The TAC alleges that Birdsey instructed an EYP employee not to discuss the details of the SUNY project.  Plaintiffs attempt to paint this instruction in a negative light, asking the Court to infer that Birdsey's instructions are evidence of wrongdoing.  However, Birdsey's instructions could have been an executive directive to maintain the confidentiality of an ongoing project.  Plaintiffs point to the no-bid nature of the process and the indictment of SUNY official as further knowledge that something was amiss with the SUNY project.  In sum, Plaintiffs argue that Defendants should not have based EYP's 2016 valuation of the SUNY project because of information that was disclosed in 2018.  Plaintiffs have not pleaded with any facts with particularity that would allow the Court to infer that Birdsey's involvement and understanding of the SUNY deal was somehow fraudulent.  *See, e.g.*, *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (ruling that Plaintiffs' pleadings "which couple[d] a factual statement with a conclusory allegation of fraudulent intent" did not meet the requirement of Rule 9(b).").

Plaintiffs' core complaint, it seems, is that Defendants were too optimistic about the firm's value.  But "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be

10

confident about their stewardship and the prospects of the business that they manage." *Shields*, 25 F.3d at 1129–30.

Although Plaintiffs' allege a litany of statements made by Defendants, their allegations are too general to meet the requirements under Rule 9(b) and PSLRA. Where the statements are not attributed to individuals, they are attributed to an undefined number of the Defendants. This satisfies neither the individual or group pleading standard. Where statements or omissions are attributed to an individual defendant, the TAC again fails to plead with sufficient particularity

Accordingly, the Court finds that Plaintiffs have not met the pleading requirements under Rule 9(b) and PSLRA.

## B. The Court Declines to Exercise Supplemental Jurisdiction Over the Remaining State Law Claims

Under 28 U.S.C. § 1367(c)(3), the Court may exercise supplemental jurisdiction over Plaintiff's remaining state law claims after dismissing "all claims over which it has original jurisdiction." However, the Second Circuit encourages courts to avoid exercising supplemental jurisdiction. "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991)).

Having dismissed Plaintiffs' securities fraud claims and there being no other basis for federal jurisdiction over this case, the Court elects to not exercise its supplemental jurisdiction over Plaintiff's state law claims. *See* 28 U.S.C. § 1367(c)(3); *Boustany v. Xylem Inc.*, 235 F. Supp. 3d 486, 496–97 (S.D.N.Y. 2017). Accordingly, those claims are dismissed without prejudice.

## CONCLUSION

For the reasons set forth above, Defendants motions for dismiss are granted. The Clerk of the Court is respectfully directed to terminate ECF No. 112 and close this case.

**SO ORDERED.**

Dated:   March 31, 2022
         New York, New York

**ANDREW L. CARTER, JR.**
**United States District Judge**